# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
June 28, 2011 Session

## IN RE FISK UNIVERSITY

**Appeal from the Chancery Court for Davidson County**
**No. 052994III     Ellen H. Lyle, Chancellor**

---

**No. M2010-02615-COA-R3-CV - Filed November 29, 2011**

---

FRANK G. CLEMENT, JR., J., concurring in part and dissenting in part.

I concur with the majority's decision to affirm the trial court's grant of *cy pres* relief. I write separately to state that I respectfully disagree with the majority's decision to reverse the trial court's limitation of the funds awarded to Fisk University to $10 million and the corresponding requirement that the University establish an endowment with the remaining $20 million.

As we explained in our opinion in the first appeal of this matter, *Georgia O'Keeffe Foundation (Museum) v. Fisk University*, 312 S.W.3d 1 (Tenn. Ct. App. 2009), we concluded that it was premature for this court to determine what, if any, *cy pres* relief Fisk University may be entitled to receive. This conclusion was based on the fact that the University had established two of the three essential prongs of the *cy pres* analysis; however, the University had not yet established whether "the change of circumstances subsequent to the gift render literal compliance with the conditions impossible or impracticable." *Id*. at 19-20. For that reason we remanded the case with the following instructions:

> Accordingly, a determination of whether any form of *cy pres* relief is available must be held in abeyance unless and until the trial court, on remand, finds that literal compliance with the conditions imposed by Ms. O'Keeffe are impossible or impracticable. *If cy pres relief is available to the University, then the trial court is to fashion a form of relief that most closely approximates Ms. O'Keeffe's charitable intent.*

*Id*. (emphasis added).

On remand, the trial court correctly determined that, due to the University's apparently dire financial condition, it was impracticable for the University to comply with all of the

conditions imposed by Ms. O'Keeffe. Based upon this finding of fact, the trial court considered the various options presented by the parties. Thereafter, in the exercise of its discretion, the trial court fashioned relief it believed to closely resemble Ms. O'Keeffe's general intent. I am of the opinion the trial court did just that, thus it did not abuse its discretion by fashioning the relief as it did. Accordingly, I would affirm the trial court in all respects.

As the trial court explained in its November 3, 2010 Memorandum and Order, it approved the Revised Sharing Agreement between the University and the Crystal Bridges Museum, explaining that the agreement was consistent with Ms. O'Keeffe's general intent, which was to provide Nashville and the South access to the Collection in order to promote the study of art *and* the placement of the Collection at Fisk University. As the trial court further explained, if Fisk University were to close, "it would frustrate a unique aspect of the O'Keeffe donation." It was for these reasons that the court approved the sale of a one-half interest in the Collection and required that $20 million of the $30 million to be paid by Crystal Bridges be placed into an endowment for the benefit of the Stieglitz Collection and the promotion and study of art and, specifically, the art of the Collection. The remaining $10 million would be paid to the University to use at its discretion in order to keep the University open.

Although the University makes an earnest argument that it needs the entire $30 million to be financially viable, the *cy pres* doctrine "may not be employed simply to promote what the court views as a worthy charitable agenda; . . ." *Bd. of Trustees of Museum of American Indian, Heye Found. v. Bd. of Trustees of Huntington Free Library and Reading Room*, 610 N.Y.S.2d 488, 499 (N.Y. App. Div. 1994). As that court further explained, *cy pres* is:

> [A] power whose permissible use is confined to the perpetuation and advancement, to the extent possible, of the particular dispositional agenda prescribed in the dispositional instrument. Thus, while a court in the exercise of the *cy pres* power may disregard specifically prescribed restrictions, limitations or directions respecting the way in the (sic) which the dispositional purposes are to be achieved, it may do so only insofar as such variance facilitates or is at least compatible with the realization of the full dispositional design; it may not do so where the result would be a dilution of any significant and practicable dispositional purpose.

*Id.* (internal citations omitted).

-2-

As the *Heye* court further explained:

> [I]t is not within the *cy pres* power simply to release dispositional assets from the constraints of a dispositional design; indeed, it is the very essence of *cy pres* that any deviation from the original dispositional plan be pursuant to an alternate plan of disposition sufficiently detailed to provide the necessary assurance that the original dispositional design will be, to the extent practicable, effectively carried forward.

*Id.* at 500.

Here, the record reveals no intent on the part of Ms. O'Keeffe to fund the general operations of Fisk University or the costs of maintaining the Collection. Instead, the clear and expressed intent of Ms. O'Keeffe was to bestow upon the University the unique opportunity "to expose Nashville and the South to the art," meaning her art and that of her husband, Alfred Stieglitz. As the majority correctly noted, "a secondary consideration and motivating factor in Ms. O'Keeffe's dispositional design was the placement of the Collection at Fisk." As the majority states in the opinion:

> In making gifts of the entire Stieglitz artwork to various institutions, Ms. O'Keeffe exercised a general charitable intent; she made the conscious decision that exposure to the Collection in the South would be at Fisk. There is no doubt that placing the art at Fisk was a strong social statement and integral to Ms. O'Keeffe's general intent to expose Nashville and the South to the art. The trial court's finding that the art would not be in Nashville, or the South, but for Fisk is fully supported by the evidence.

I fully agree with the majority's holding that the trial court properly considered this factor in fashioning the appropriate *cy pres* relief. I further submit that this finding by the trial court is a key element that justifies the relief as fashioned by the trial court, especially the decision to award the University $10 million to address its current financial predicament and to place the remaining $20 million in a restricted endowment to fund the cost of maintaining the Collection in the future.

The Attorney General asserts that Fisk University is not entitled to receive any of the proceeds from this sale. For reasons stated above, *inter alia*, I find merit to this argument; however, depriving the University of any of the proceeds may result in the University closing its doors, which would be contrary to Ms. O'Keeffe's intentions. The trial court made the finding that the University could not afford to currently maintain the Collection. This fact is admitted by the University and the Attorney General did not dispute the University's inability

to fund the cost of maintaining the Collection. The record reveals the current cost to maintain the Collection is approximately $131,000 a year. The record also reveals that the cost to maintain the Collection in the future will likely be substantially greater, perhaps in excess of $1 million a year. As the majority noted, the University's costs to maintain the Collection in the future may not be as much as $1 million a year; nevertheless, the record convinces me that it will be substantially greater that $131,000 a year, an amount the University cannot presently afford. Thus, it is apparent that the University will not be able to maintain the Collection in the future, at least not without financial assistance.

As I noted above, in the exercise of its *cy pres* powers the courts may, to some degree, revise specific limitations or directions regarding the way in which the dispositional purposes are to be achieved; however, the courts *"may do so only insofar as such variance facilitates or is at least compatible with the realization of the full dispositional design." Heye*, 610 N.Y.S.2d at 499 (emphasis added). As the *Heye* court explained in detail:

> What the law recognizes in its imposition of far more stringent, dispositionally based conditions on the use of the cy pres power, is that the consequence of so easily dispensing with a grantor's directions would be to discourage charitable giving and to rob charitable institutions of the stability necessary to the discharge of their purposes. Doubtless it is better in the end for society to reap the benefit of charitable giving even in the form of dispositions imperfectly suited to the achievement of their purposes, than to forego the benefits of charity altogether in the course of pursuing by judicial means some almost certainly elusive ideal reallocation of charitable resources.

*Id*. at 501.

Based upon the record before us, I submit that giving the entire $30 million to Fisk University to be used as it deems necessary, albeit for a very worthy cause, cannot be justified under the restraints of *cy pres*. Speaking bluntly, the University seeks to monetize the Collection, as President O'Leary testified, in order to infuse much needed capital. To do so would change the form of the conditional charitable gift by converting the Collection into money, which is in direct conflict with Ms. O'Keeffe's expressed intent. The record clearly reveals that Ms. O'Keeffe never intended for the Collection to be sold or otherwise monetized in order for Fisk University to pay its general operating expenses. Ms. O'Keeffe's stated intent was to expose the Collection to the South by having it exhibited at Fisk University. However, due to the University's apparently dire financial condition, it is no longer practicable for the University to bear the entire financial burden to exhibit the Collection. This is why approving the Revised Sharing Agreement with Crystal Bridges, placing $20 million in a restricted endowment to assure the future maintenance of the

Collection at Fisk or, if not Fisk, at another custodial institution in the Nashville area, and awarding Fisk University $10 million to rise above its current financial predicament is a form of relief that closely approximates Ms. O'Keeffe's charitable intent and, thus, is permissible under *cy pres* principles.

For the above reasons, I would affirm the *cy pres* relief as granted, including specifically the trial court's requirement that a $20 million endowment be established to assure the future maintenance of the Collection.

_____
FRANK G. CLEMENT, JR., JUDGE